IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


CHOICES IN COMMUNITY LIVING,  :
  INC., *et al.*,

                    :

        Plaintiffs,       :      Case No. 3:11-cv-19

                    :

        vs.              JUDGE WALTER HERBERT RICE

                    :

MICHAEL J. PETKUS, JR.,
  *et al.*,                 :

        Defendants     :

---

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DOC. #22); JUDGMENT TO ENTER IN
FAVOR OF DEFENDANTS AND AGAINST PLAINTIFFS; TERMINATION
ENTRY

---

      Plaintiffs, Choices in Community Living, Inc., and Miami Valley Fair Housing

Center, Inc., filed suit against Michael J. Petkus, Jr., d/b/a Real Living Petkus

Realtors, and real estate agent Kathryn Storey, alleging violations of the Fair

Housing Act, 42 U.S.C. §§ 3604(f)(1)-(3) and 3604(c). This matter is currently

before the Court on Defendants' Motion for Summary Judgment. Doc. #22. For

the reasons set forth below, the Court sustains that motion.

## I.    Background and Procedural History[1]

Choices in Community Living, Inc. ("CICL"), is a private, non-profit organization dedicated to providing homes and other services to individuals with developmental disabilities.  Compl. ¶ 7.  CICL employee Celeste Boehm was searching for a house for four unrelated men with cognitive disabilities.  She was particularly interested in a four-bedroom ranch advertised for rent at 4959 Strathaven Drive in the Forest Ridge neighborhood in Dayton, Ohio.  It was in a residential area, close to a bus stop.  Boehm Dep. at 23, 38.  The house was owned by Melvin and Sunnie Smith, who were temporarily stationed in Hawaii on military duty.  The property was managed by Defendant Kathryn Storey of Real Living Petkus Realtors.  Storey Dep. at 14.

Late in the afternoon on December 3, 2009, Boehm contacted Storey to inquire about the property and to arrange for a viewing.  Boehm Dep. at 42.  It was the policy of the agency to pre-screen all prospective tenants prior to scheduling a viewing.  If the prospective tenant was not qualified, it would be a waste of time to show the property.  Storey Dep. at 26.  Monthly rent for the house on Strathaven was $995.  The agency required the tenant's monthly income to be three times that amount.  *Id.* at 39.  All prospective tenants were also asked

---

[1] As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

whether they had any pets and how many people would be living in the house.

Storey began to go through the pre-screening checklist with Boehm. According to Boehm, as soon as she told Storey that she was calling on behalf of four gentlemen with disabilities, Storey said, "We're not set up for disabilities." Boehm Dep. at 43. Boehm explained that the men had developmental disabilities rather than physical disabilities so there was no need for the house to be handicapped-accessible. Storey then responded that she would have to check the homeowners' bylaws. She also indicated that she was leaving that day on vacation and would not be back for more than a week. *Id.* at 43-44.

Boehm did not have the income information for the prospective tenants readily accessible but she agreed to gather it together and call Storey right back. She also checked the Forest Ridge Homeowners' Association website and saw that the bylaws were posted there. She then called Storey back and gave her the Social Security income information for "the three guys that we were pretty sure were going to move in." *Id.* at 43-45. Their monthly income totaled only $1880, well below the required amount. Ex. 22 to Storey Dep., Doc. #19-2, PAGEID #408. At that point, the identity of the fourth prospective tenant had not yet been determined. Boehm told Storey, however, that CICL would guarantee the rent payments. Boehm Dep. at 47.

Storey indicated that she still needed to check the bylaws. When Boehm asked Storey if the bylaws in question were the ones on the Forest Ridge website,

3

Storey responded that they were not. Storey agreed to call Boehm when she returned from vacation, after she had the opportunity to conduct the necessary research. Boehm asked if there was anyone else who could show her the property in the meantime, but Storey said that was not an option. *Id.* at 44-49.

Boehm told her supervisor that Storey appeared to be very reluctant to rent the property to CICL's developmentally disabled clients. *Id.* at 48-54; Weaver Dep. at 102. They decided to contact the Miami Valley Fair Housing Center, Inc. ("MVFHC"), a private, non-profit organization whose mission is to eliminate all forms of illegal housing discrimination. Boehm Dep. at 50; Compl. ¶ 8.

Boehm told Anita Schmaltz, MVFHC's Enforcement Coordinator, about her phone calls with Storey. She also told Schmaltz that she had looked at the Forest Ridge Homeowner's Association bylaws online, and that there did not appear to be any restrictions that would prohibit the men from living there. Schmaltz Dep. at 11. In order to make sure that Storey was not just giving Boehm the "runaround," Schmaltz called Real Living and confirmed that Storey was truly out of town and that no one could view the property until she returned. *Id.* at 13-14.

On December 14, 2009, Storey's first day back from vacation, Boehm contacted her again about a viewing. Storey said that she could not yet show Boehm the property because she was still looking for the bylaws. She denied that she was trying to discourage Boehm from pursuing the lease. Boehm Dep. at 44, 60.

On December 15, 2009, Schmaltz, acting as a "tester" and representing herself as "Anna Nelson," called to inquire about the property and to schedule a viewing. Schmaltz Dep. at 15. On the same date, another tester, Shanda Sulfridge, a CICL employee, also contacted Storey about viewing the property. Boehm Dep. at 56-57. They provided Storey with qualifying income information and, on December 16, 2009, Storey showed them both the house in question.[2] Storey Dep. at 52.

On December 17, 2009, Boehm left a message for Storey, requesting an immediate showing of the property, but Storey had not yet confirmed that she could lawfully rent the property to the men. Storey testified that, in conducting her research earlier that week, she had found a Dayton zoning ordinance that appeared to prohibit three or more unrelated parties from living in a house that was zoned as a single-family residence. Storey Dep. at 40-42. In an attempt to clarify the issue, she left a voice mail message with the City of Dayton's Zoning Office on December 17th. When she received no response, she left another message on December 21st. *Id.* at 37.

On December 21, 2009, Storey also sent an email to Sunnie Smith. With respect to CICL's inquiry about renting the property, Storey stated, "[t]he way I

---

[2] Nelson stated that her monthly income was $4000, and that she would be living there with her husband and two children. Sulfridge stated that her monthly income was $5500 and that she would be living there with her two teenagers. Ex. 27 to Storey Dep., Doc. #19-2, PAGEID #418; Boehm Dep. at 59.

read the law, if you have more than three unrelated persons living in a home, it has to be licensed as a rooming house, which would automatically rule out the lady from the community organization.  I am just trying to get confirmation on that fact so we can definitely rule that out."  Ex. 10 to Storey Dep., Doc. #19-2, PAGE ID #377.

On December 22, 2009, Storey received a letter from Jim McCarthy, MVFHC's Executive Director, expressing concern about her allegedly discriminatory refusal to show the property to Boehm.  McCarthy requested that the property not be shown to any other prospective tenants until CICL was given the opportunity to view it.  McCarthy requested a written response and threatened to "take appropriate steps through administrative or judicial proceedings" if CICL were not provided with equal housing opportunities.  Ex. 28 to Storey Dep., Doc. #19-2, PAGEID ##429-30.

That same evening, Storey drafted a response to McCarthy's letter.  She explained that it was company policy that all prospective tenants had to be screened before scheduling a showing.  Boehm had indicated that four men would be living in the house, but she was able to provide income information for only three of them, and their combined income was insufficient.

Storey was also concerned that the four men were unrelated.  She explained to McCarthy that Section 93 (Housing Ordinance) of the City of Dayton Code of Ordinances appeared to indicate that the proposed living arrangement would

6

constitute a "rooming house," requiring an annual permit and inspections. She stated that the property owners had no desire to convert the single-family residential use of the property, and she was unaware of any statute that required them to do so. She noted that she had left two messages with the zoning office, seeking clarification of her interpretation of that ordinance.

Storey acknowledged her duty to schedule showings for all qualified applicants, and stated that she would be happy to schedule a showing for the men once Boehm provided qualifying income information, and once it was determined that the intended use of the property did not violate any local zoning ordinances. She explained to McCarthy that she had a fiduciary duty to represent the owners to the best of her ability, and wanted to be sure that they made an informed decision. Ex. 3 to Storey Dep., Doc. #19-2, PAGEID ##364-66.

The following day, December 23, 2009, Storey spoke with David Wombold of the City of Dayton Zoning Office. He confirmed that three or more unrelated parties living in the house in question would violate the zoning code. In order for the men to reside in the house, the owners would have to apply for a new occupancy permit and request that the property be changed from a single-family residence to a residential facility. If they later chose to sell the property, they would have to apply for another variance to revert it to a single-family residence. Storey Dep. at 41-42.

7

On December 28, 2009, after returning to the office after the Christmas holiday, Storey wrote to Jim McCarthy, telling him what she had learned from Wombold. She again indicated that she was unaware of any law that required the owners to change the use of their property from a single family residence to accommodate the proposed tenancy. She told McCarthy that if he had any authority to the contrary, they could continue the application process. In the meantime, she would resume showing the property to other prospective tenants. Ex. 6 to Storey Dep., Doc. #19-2, PAGEID #369.

On December 30th, Storey showed the house to David Hanson and his wife, who met the pre-screening requirements. When Hanson called to inquire about the property, he identified himself as a disabled veteran. They submitted a rental application on December 31st. Storey Dep. at 71-78.

On December 31, 2009, Storey received a letter from Jim McCarthy, enclosing a copy of a letter he had hand-delivered to the Director of the City of Dayton Law Department, asking the City to provide a reasonable accommodation so that CICL's clients could lawfully reside in the Strathaven Drive property. He again requested that Story show the property to Boehm and to refrain from showing the property to other potential renters until he had a response from the City. Ex. 14 to Storey Dep., Doc. #19-2, PAGEID #381. Storey forwarded McCarthy's letter to the Smiths and suggested that they contact an attorney.

8

The Hanson's rental application was approved on January 4, 2010. Storey Dep. at 70. On January 6, 2010, Storey responded to McCarthy, noting that, in his letter to the Law Director, he had omitted the fact that Boehm had not yet provided qualifying income information for all four prospective tenants. She also reiterated the fact that she believed that the proposed tenancy would violate the zoning code. Ex. 15 to Storey Dep., Doc. #19-2, PAGEID #382.

On that same date, after meeting with an attorney, the owners directed Storey to disregard McCarthy's request to refrain from showing the property to others, and directed her to rent the property to the Hansons. Ex. 13 to Storey Dep., Doc. #19-2, PAGEID #380. The Hansons executed the lease on January 11, 2010. Storey Dep. at 73.

On January 13, 2010, Steven Carne, Zoning Administrator for the City of Dayton, responded to McCarthy's letter and stated that CICL's proposed use of the Strathaven Drive property was, in fact, permitted under the City of Dayton Zoning Code. Ex. 18 to Storey Dep., Doc. #19-2, PAGEID #388.[3] On January 22, 2010, McCarthy renewed his request that Storey show the Strathaven Drive property to CICL. He also requested, for the first time, that the real estate agency make a "reasonable accommodation" to its policy and allow CICL to execute the lease and then sublet the property to its clients. Ex. 19 to Storey Dep., Doc. #19-2, PAGEID #389.

--------------------------------------------------

[3] Whether the City granted CICL's request for a reasonable accommodation or whether David Wombold, Carne's subordinate, was simply incorrect in his initial response to CICL is unclear from the record.

9

On January 26, 2010, Defendant Michael Petkus responded to McCarthy's letter, notifying him that the subject property had already been rented to a disabled veteran and his family, but that Petkus Realtors would be happy to work with CICL in the future should another suitable property become available.  Ex. 20 to Storey Dep., Doc. #19-2, PAGEID #390.

MVFHC and CICL then filed complaints of discrimination with the City of Dayton Human Relations Council ("HRC") and the United States Department of Housing and Urban Development.  In December of 2010, the HRC determined that there was probable cause to believe that Storey and Petkus had engaged in discriminatory housing practices.  Compl. ¶28.  Plaintiffs filed suit in January of 2011, alleging violations of the Fair Housing Act ("FHA").  Defendants have now moved for summary judgment.

## II.     Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994). Summary judgment is appropriate only where the evidence raises no genuine issue of material fact "such that no reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder

11

of fact because they may reasonably be resolved in favor of either party.'"

*Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Analysis

The Fair Housing Act ("FHA") makes it illegal to discriminate in the rental "or to otherwise make unavailable or deny" a dwelling to any renter because of a handicap of the renter, any person who will reside in that dwelling, or any person associated with that renter. 42 U.S.C. § 3604(f)(1). It is also illegal to discriminate against anyone in the "terms, conditions, or privileges" of rental because of such a handicap. 42 U.S.C. § 3604(f)(2). "Discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The FHA also prohibits the making of any statement, with respect to the rental of a dwelling, "that indicates any preference, limitation, or discrimination" based on handicap. 42 U.S.C. § 3604(c). Plaintiffs' Complaint alleges that "Defendants' actions, behavior, and failure to allow reasonable accommodations" violated these statutory provisions. Compl. ¶34.

Plaintiffs have presented no direct evidence that Defendants refused to show the property or rent the house because the prospective tenants were developmentally disabled.[4] Therefore, Plaintiffs' FHA claims are analyzed using the

---

[4] Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in the decision. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). First, the plaintiffs must "present evidence from which a reasonable jury could conclude that there exists a *prima facie* case of housing discrimination." If they satisfy their burden, the burden shifts to the defendants to proffer evidence of a legitimate, non-discriminatory reason for the action taken. If the defendants meet their burden, plaintiffs must then present sufficient evidence from which a reasonable jury could find that the proffered reason is pretextual. *Id.* at 414-15.

### A. *Prima Facie* Case

The FHA contemplates three types of discrimination claims – disparate treatment, disparate impact, and failure to make reasonable accommodations. *Astralis Condo. Ass'n v. Secretary, U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 66 (1st Cir. 2010) (citing *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996)). As Defendants aptly point out, it is not clear under which of these theories Plaintiffs seek recovery. Plaintiffs' claims, which center on Storey's refusal to show the property to Boehm, do not neatly fit into any of these traditional categories. Defendants maintain that because Plaintiffs have failed to establish a *prima facie* case of discrimination under any of these theories, summary judgment is appropriate.

### 1. Disparate Treatment

To establish a *prima facie* case of housing discrimination under a "disparate

14

treatment" theory, a prospective tenant must show that: (1) he or she is a member of a protected class; (2) he or she applied for and was qualified to rent the property in question; (3) he or she was rejected; and (4) the rental property remained available thereafter. *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634-35 (6th Cir. 2000).

Defendants argue that CICL's clients were not qualified tenants because: (1) they did not have a combined monthly income of three times the monthly rent; and (2) four unrelated individuals living together in the house would violate local zoning ordinances. The Court need not address the first issue in great detail because Defendants have conceded that they would have been willing to make a reasonable accommodation with respect to the income requirement since CICL was willing to guarantee the rent. It was the zoning issue that was the major obstacle. Storey Dep. at 64; Petkus Dep. at 27-28; Ex. 22 to Storey Dep., Doc. #19-2, PAGEID #399.

Based on her own research and her conversation with David Wombold of the City of Dayton's Zoning Office, Storey believed that the proposed use of the property would be unlawful. By the time Storey learned that the proposed use would, in fact, be permitted, the property was no longer available because the Hansons had already signed the lease.

The fact that Storey agreed to show the property to the non-disabled testers, "Anna Nelson" and Shanda Sulfridge, but refused to show it to Boehm, is

15

of little help to Plaintiffs' claim of disparate treatment.  It is undisputed that the income information provided by "Anna Nelson" and Shanda Sulfridge met the agency's requirements.  Moreover, because each said that they planned to live there with their families, there were no zoning impediments.  In short, they were not similarly situated to CICL's clients.  Nelson and Sulfridge were qualified renters; CICL's clients were not.  Under the circumstances presented here, Plaintiffs cannot establish a *prima facie* case of disparate treatment.

### 2.    Disparate Impact

In a disparate impact case, a plaintiff challenges a facially-neutral policy or practice that has a statistically disproportionate adverse impact on a protected class.  *See Graoch Assocs. #33 L.P. v. Louisville/Jefferson County Metro Human Rels. Comm'n*, 508 F.3d 366, 372 (6th Cir. 2007).  Plaintiffs do not allege that any of Defendants' policies or practices have a disproportionate impact on handicapped individuals, and none of the facts alleged in the Complaint support such a claim.

### 3.    Failure to Make Reasonable Accommodations

Plaintiffs' Complaint specifically alleges a "failure to allow reasonable accommodations."  Compl. ¶34.  In order to succeed on such a claim, Plaintiffs must prove that:  (1) the prospective tenants were disabled; (2) defendants knew or reasonably should have known of the disability; (3) the requested accommodation may be necessary to afford "an equal opportunity to use and enjoy

16

the dwelling;" (4) the requested accommodation is reasonable; and (5) defendants refused to make the requested accommodation.  *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011) (citing *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005)).

In their motion for summary judgment, Defendants argue that Plaintiffs cannot establish a *prima facie* case under this theory because Plaintiffs requested no accommodation from them until January 22, 2010, when Plaintiffs asked Defendants to allow CICL to execute the lease and then sublet the property to its clients.  Ex. 19 to Storey Dep.  By this time, the Hansons had already executed the lease and the property was no longer available, rendering the request unreasonable.[5]

In their memorandum in opposition to the motion for summary judgment, Plaintiffs clarify the basis for their claim as follows: "whatever 'rules, policies, or practices' Storey was following that prevented her from 'showing' the property to Boehm in December, 2009, Boehm was seeking an 'accommodation' to those rules, and [] Storey refused."  Doc. #23, PAGEID #627.  Plaintiffs maintain that regardless of whether CICL's clients met the income qualifications, and regardless of whether the proposed tenancy would have violated local zoning ordinances,

---

[5] The only other accommodation requested by Plaintiffs occurred on December 31, 2009, when MVFHC asked the *City of Dayton* to make an exception to the zoning ordinance so that CICL's clients could lawfully reside at the property in question.  Ex. 14 to Storey Dep., Doc. #19-2, PAGEID #381.

Storey should have allowed Boehm to view the property to determine whether it would meet CICL's needs. If the property was acceptable, then Boehm could take whatever additional steps were deemed necessary to move forward.

Assuming *arguendo* that Plaintiffs' repeated requests to allow CICL to view the property were sufficient to put Storey on notice that they were requesting a "reasonable accommodation" to the agency's established policy of showing properties only to qualified renters, the fact remains that the requested accommodation was not "necessary" to afford the CICL clients an equal opportunity to rent the house in question. "In order to prove that an accommodation is 'necessary,' '[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'" *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (quoting *Smith*, 102 F.3d at 795).

In this case, if the proposed tenancy would be unlawful because it violated the local zoning ordinance, showing the property to Boehm accomplishes nothing. Even if Boehm found the property to be acceptable, the zoning ordinance would have prevented her clients from living there, or so it seemed at the time. As such, Plaintiffs cannot show that, "but for the accommodation," CICL's clients would likely be denied an "equal opportunity" to live there. The Court therefore

finds that Plaintiffs cannot establish a *prima facie* case of "failure to accommodate."

### 4. Other Circumstantial Evidence

The fact that Plaintiffs cannot succeed under one of the three traditional theories of housing discrimination does not necessarily end the inquiry. The Supreme Court has held that "the precise requirements of a prima facie case can vary depending on the context." They are not intended to be "rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Moreover, the burden of establishing a *prima facie* case of discrimination "is not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Even if a plaintiff cannot establish all of the traditionally required elements of a claim of housing discrimination, this is not necessarily fatal. Several cases are illustrative.

In *Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009), an African-American couple entered into contract to buy real property. Within a couple of days after discovering that the buyers were African-American, the seller terminated the contract, deciding to keep the property in the family for "sentimental reasons." True to his word, he did not re-list the property. This meant that the buyers could not establish that the property remained available for sale, a required element of a *prima facie* case of disparate treatment under *Mencer*.

The Sixth Circuit held that even though Plaintiffs could not establish this final element, this was "not necessarily fatal to a *prima facie* housing discrimination claim on summary judgment so long as there exists 'additional evidence' from which a reasonable juror could find an inference of discrimination." *Id.* at 416. The key question is "whether the plaintiffs have presented sufficient evidence to permit a reasonable jury to conclude they suffered an adverse housing action under circumstances giving rise to an inference of unlawful discrimination, not whether the *prima facie* elements specifically articulated in *McDonnell Douglas* - as reinterpreted by *Mencer* for housing cases - could be established." *Id.* (internal quotations omitted). The court found that the fact that the seller terminated the purchase agreement just days after learning that the buyers were African-American provided a sufficient evidentiary basis for inferring a discriminatory motive. *Id.* at 418.

In *Darby v. Heather Ridge*, 806 F. Supp. 170 (E.D. Mich. 1992), an African-American couple inquiring about an apartment were treated in an unfriendly and unwelcoming manner by the employees in the leasing office. Even though three leasing agents were present, the couple was told that no one was available to assist them and that they should come back in an hour. When they did as requested, they were forced to wait an additional 30 minutes before being shown the property. On the tour, when they commented that their son would love the swimming pool, they were falsely told that children were not permitted in the pool.

20

They wanted to fill out a rental application and leave a deposit, but were told that this would be useless because no vacancy was expected for 3-4 months. Because they left without submitting a rental application, they could not establish that they "applied for" the apartment, one of the required elements of a *prima facie* case.

The court nevertheless refused to grant the defendants' motion for summary judgment. It found that the alleged "dilatory tactics, slight misrepresentations of fact, and subtle behavior intended to frustrate plaintiffs' attempts to secure housing at Heather Ridge" were sufficient to create a genuine issue of material fact concerning whether the plaintiffs were victims of discrimination. *Id.* at 175.

In reliance on these cases, Plaintiffs urge the Court to find that even if they cannot establish a prima facie case of discrimination by any of the traditional methods, the facts presented here, viewed in a light most favorable to Plaintiffs, give rise to an inference of discrimination.

In support of this argument, Plaintiffs cite to the following facts. According to Boehm, as soon as she told Storey that she was looking for a house for four men with disabilities, Storey immediately said that the house was "not set up for disabilities." When Boehm explained that the disabilities were cognitive rather than physical, Storey then allegedly began looking for other excuses not to show the property to her.

Boehm testified that Storey never told her what the income requirements were and never suggested to her that the income figures she provided were

21

insufficient. Boehm Dep. at 47.[6] Instead, Storey said that she could not show the property because she was leaving on vacation in an hour. When Boehm asked if another agent could show the property while Storey was gone, Storey refused, saying that she also needed to check the bylaws. *Id.* at 48-49. According to Boehm, Storey never mentioned anything to her about needing to research zoning ordinances. *Id.* at 46.[7]

After Storey returned from vacation, she still refused to show the property to Boehm, but scheduled viewings for other potential renters. In her December 22, 2009, response to McCarthy's inquiry about her refusal to show the property to Boehm, Storey stated that she was not in a position to show the property to Boehm because: (1) Boehm had not yet identified all four prospective tenants or shown that they met the income requirements; and (2) there was some question about whether the proposed tenancy would violate zoning ordinances. Ex. 3 to Storey Dep., Doc. #19-2, PAGEID ##364-66. Plaintiffs maintain that this is the first they heard of any potential zoning concern. McCarthy Dep. at 46.

Plaintiffs argue that a reasonable jury could find that Storey was using stall tactics and manufacturing reasons not to show the property to Boehm. In a December 21, 2009, email, Storey told Sunnie Smith that she was waiting to hear

---

[6] Storey testified that she did tell Boehm that the tenants' combined monthly income had to be three times the rent. Storey Dep. at 21.

[7] Storey testified that she told Boehm that she needed to check on zoning issues. Storey Dep. at 23, 30, 34.

22

back from the Zoning Office.  Storey said that if her interpretation of the ordinance was correct, it "would automatically rule out the lady from the community organization."  Ex. 10 to Storey Dep., Doc. #19-2, PAGEID #377.

Plaintiffs maintain that other circumstances also support an inference of discrimination.  The house in question had remained vacant for six months. Storey's refusal to show the house to Boehm was contrary to the financial interests of the homeowners, particularly since CICL was willing to guarantee the rent payments.  *See Keck v. Graham Hotel Sys., Inc.*, 566 F.3d 634, 641 (6th Cir. 2009) (holding that an inference of discrimination may arise when a business acts in a manner "profoundly contrary to the manifest financial interests" at stake).

Viewing the evidence in a light most favorable to the Plaintiffs, and keeping in mind that the burden of establishing a *prima facie* case is not intended to be onerous, the Court concludes that a reasonable jury could find that the circumstances presented here give rise to an inference of unlawful discrimination. That inference is not very strong, but it is sufficient to establish a *prima facie* case.

### B.  Legitimate, Non-Discriminatory Reason

Assuming *arguendo* that Plaintiffs have satisfied their burden of establishing a *prima facie* case of handicap discrimination, the burden shifts to Defendants to proffer a legitimate, non-discriminatory reason for the action taken.  Defendants maintain that, in accordance with their company policy, they refused to show the property to Boehm because it had not yet been established that the prospective

23

tenants were qualified.

It is undisputed that the combined income of the three prospective tenants who were identified by Boehm did not equal three times the monthly rent as required. CICL, however, was willing to guarantee the rental payments, and Defendants have conceded that this would have been an acceptable arrangement. Therefore, in the Court's view, this proffered reason for refusing to show the property is largely irrelevant at this point.

Defendants also maintain that the prospective tenants were not qualified because the proposed living arrangement appeared, at that time, to violate the City of Dayton's zoning ordinance prohibiting three or more unrelated individuals from living together in a single dwelling unless that dwelling was converted to a "rooming house." As Storey indicated in her December 22, 2009, letter to McCarthy, she has a fiduciary duty, as a realtor, to represent her clients to the best of her ability. She would be remiss if she allowed them to enter into an unlawful tenancy, subjecting them to fines or other legal repercussions. Ex. 3 to Storey Dep., Doc. #19-2, PAGEID #365. The Court finds that Defendants have satisfied their burden of proffering a legitimate, non-discriminatory reason for refusing to show the property to Plaintiffs.

### C. Pretext

The burden therefore shifts back to Plaintiffs to establish, by a preponderance of the evidence, that the proffered reason is pretextual or unworthy

of belief.  *Graoch Assocs. #33, L.P.*, 508 F.3d at 371.  The evidence presented is insufficient to create a genuine issue of material fact such that a reasonable jury could find in Plaintiffs' favor with respect to the question of pretext.

Slight negative connotations could be read into Storey's alleged statement to Boehm about the property not being "set up for disabilities," and into her email to Sunnie Smith about the zoning ordinance "which would automatically rule out the lady from the community organization."  However, even viewing this evidence in light most favorable to the Plaintiffs, Plaintiffs have produced nothing more than a scintilla of evidence to support their claim that the proffered reason for refusing to show the property to Boehm was unworthy of belief.  The evidence presented is insufficient to create a genuine issue of material fact such that a reasonable jury could return a verdict in Plaintiffs' favor.

It is undisputed that no one was shown the property while Storey was on vacation.[8]  It is also undisputed that Defendants consistently applied their policy of showing the property only to qualified prospective tenants.  As Storey has explained, it would be a waste of time to show the property to individuals who lacked sufficient income, or to individuals whose tenancy would violate local

---

[8] When tester Shanda Sulfridge talked to Storey about viewing the property, Storey allegedly apologized for the delay and told her that someone else could have shown her the property while she was on vacation.  Ex. C to Doc. #23.  Storey denies making this comment.  Storey Dep. at 54-55.  In any event, the Court agrees with Defendants that Sulfridge's statement, set forth in her unsworn narrative about her conversation with Storey, is inadmissible hearsay and cannot be considered.

zoning ordinances. Storey has consistently acknowledged her legal duty to show the property to all qualified applicants regardless of disability. In fact, Defendants ultimately rented the property to the Hansons, knowing that Mr. Hanson was disabled.

Storey consistently told Plaintiffs that if the zoning obstacle could be overcome, she would gladly proceed with the application process. She has, in fact, acknowledged that the prospect of a steady stream of income, guaranteed by CICL, would be attractive to her clients. However, Storey had a fiduciary duty to her clients to make certain that the proposed tenancy was lawful. If it violated local zoning ordinances, they could be subjected to fines or other legal repercussions. In this case, Storey's concerns about the unlawfulness of the proposed tenancy were validated by David Wombold of the City of Dayton's Zoning Office. The Zoning Office did later change its mind but, by that time, the Hansons had already signed the lease and the property was no longer available.

Based on the evidence presented, it is clear that Defendants' concern lay not with the fact that CICL's clients were disabled, but rather with the fact that these were four unrelated individuals wanting to rent a house zoned for single-family use.

In support of their claim, Plaintiffs also point to the fact that Storey expressed concern about the homeowners' association bylaws, but then never followed up. Storey testified that she asked the owners for the bylaws on several occasions but was never given a copy. Storey Dep. at 23-24, 50. She explained

26

in her deposition, however, that the homeowners' association bylaws were relevant only to the question of whether the CICL clients would be able to use the neighborhood amenities, *i.e.*, the pool and other facilities, not to the question of whether the clients would be allowed to live in the house. *Id.* at 94. Once it became evident that the proposed tenancy was likely to violate the zoning ordinance, it no longer mattered whether the men would be able to use these amenities. As such, this does not support a finding of pretext.

Even viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have produced nothing more than a scintilla of evidence to support their claim of pretext. The Court concludes that the evidence presented is insufficient to create a genuine issue of material fact such that a reasonable jury could return a verdict in Plaintiffs' favor.

**IV.  Conclusion**

Assuming *arguendo* that Plaintiffs have established a *prima facie* case of disability discrimination, the evidence presented is insufficient to create a genuine issue of material fact with respect to the question of whether the reasons given by Defendants for refusing to show the rental property to Plaintiffs were pretextual. The Court therefore SUSTAINS Defendants' Motion for Summary Judgment, Doc. #22.


Judgment will be entered in favor of Defendants and against Plaintiffs. The captioned cause is hereby ordered terminated upon the docket records of the

United States District Court for the Southern District of Ohio, Western Division, at

Dayton.


Date: April 3, 2012

_____
WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE


Copies to: Counsel of Record

28